Argued and submitted November 23, 2004, reversed and remanded April 13, 2005

JURY SERVICE RESOURCE CENTER,
David Shannon, and Robert Paul Langley, Jr.,
*Appellants,*

*v.*

Wallace CARSON, Jr.;
Kinglsey Click,
Office of the State Court Administrator,
Oregon Judicial Department;
Paul Lipscomb;
James Murchison,
Office of the Marion County Circuit Court
Trial Court Administrator;
Dale Koch;
Douglas Bray,
Office of the Multnomah County Circuit Court
Trial Court Administrator;
Robert Huckleberry;
Nancy Lamvick,
Office of the Lincoln County Circuit Court
Trial Court Administrator;
Bill Bradbury; Roy Turnbaugh;
and State of Oregon,
*Respondents.*

03C-11907; A122978

110 P3d 594

Rose Jade argued the cause for appellants. With her on the brief was Karen A. Steele.

Erika L. Hadlock, Assistant Attorney General, argued the cause and filed the brief for respondents. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

The issue in this case is whether defendants' refusal to disclose certain jury pool records to plaintiffs violates either the Oregon Public Records Law (PRL), ORS 192.410 - 192.505, or some provision of the state or federal constitutions. The trial court granted defendants' motion for summary judgment. Because we conclude that defendants are not entitled to judgment as a matter of law, we reverse and remand.

The relevant facts are either procedural or relate to the identity of the parties, and they are not in dispute. Plaintiffs are Jury Services Resource Center (JSRC), a nonprofit organization interested in auditing the Lincoln County Circuit Court's jury pool selection process; Shannon, a citizen interested in scholarly research into the state's jury pool selection process and a potential juror in Multnomah County; and Langley, a man who has been convicted of aggravated murder and was awaiting a retrial of the penalty phase in that case in Marion County. Defendants are the State of Oregon and various state officials in the judicial and executive branches.

The dispute in this case centers on jury pool records consisting of "source lists," "master lists," and "term lists." "Source lists" are lists provided to the State Court Administrator by county election officials and by Department of Transportation officials, as well as "any other sources approved by the Chief Justice of the Supreme Court that will furnish a fair cross section of the citizens of the county." ORS 10.215(1). "Master lists" are "names selected at random from the source lists" at the direction of the State Court Administrator. *Id.* The master lists contain not only the names of prospective jurors but also their addresses. ORS 10.215(4). "Term lists" or "term jury lists" are names and addresses "selected at random from the master jury list * * * at the direction of the presiding judge for the judicial district or clerk of court" using a method prescribed by the presiding judge of each judicial district. ORS 10.205(2); ORS 10.225(1).

Because term lists are chosen before a term begins, the composition of any term list is always complete before the beginning of a trial at which a jury chosen from the term list might sit. ORS 10.225(1).

JSRC and Langley requested that court officials from, respectively, Lincoln County and Marion County disclose to them the contents of source lists, master lists, and term lists. When the county judicial officials denied plaintiffs' requests, they appealed to the Attorney General. *See* ORS 192.450 (Attorney General reviews denial of public record requests). He, too, denied the petitions, explaining that the requested records were exempt from disclosure under the PRL. JSRC and Langley then consolidated their various claims and sought judicial review under ORS 192.490 in Marion County Circuit Court. Shannon, who had never filed a request for any documents, was joined as a plaintiff; his claim was for declaratory judgment under ORS 28.010.[1] Instead of responding to plaintiffs' complaint with an answer, defendants moved for summary judgment. *See* ORCP 47 B (party against whom a claim is brought may move for summary judgment "at any time"). Concluding that defendant's denials did not violate the PRL or any constitutional provisions raised by plaintiffs, the trial court granted defendants' motion for summary judgment, rejected a subsequent "motion for reconsideration," and entered judgment for defendants. This appeal ensued.

Although plaintiffs' appeal contains eight assignments of error and conflates the various parties and their claims and defenses, it clearly and accurately states the issues before us: Does the PRL permit defendants to deny plaintiffs access to the requested documents? If so, do plaintiffs nonetheless have a right of access to the documents under the state or federal constitution?

■    We begin with the statutory argument. Access to public records in the possession of public bodies in Oregon is governed in the first instance by the PRL. ORS 192.420(1)

---

[1] We presume that Shannon's claim matches the other plaintiffs', that is, he seeks a declaration that either the PRL or some constitutional provision compels the state to disclose jury pool information.

expresses the overarching provision of that act: "Every person has a right to inspect any public record of a public body in this state, except as otherwise expressly provided by ORS 192.501 to 192.505." State courts, according to the act, are "public bodies." ORS 192.410(3); ORS 192.410(5). A "public record" includes "court records." ORS 192.410(4). Thus, presuming that the jury pool records at issue in this case are "court records," they fall within the scope of the PRL and must be disclosed unless "otherwise expressly provided" within the act.[2] ORS 192.420(1).

Defendants contend that such an express exception applies. ORS 192.502(9) creates an exemption for "[p]ublic records or information the disclosure of which is prohibited or restricted or otherwise made confidential or privileged under Oregon law." ORS 10.215(1), in turn, provides, in part:

"The State Court Administrator and circuit courts may use source lists obtained from private or public entities, and jury lists containing names selected from a source list, only for purposes consistent with administering the selection and summoning of persons for service as jurors, the drawing of names of jurors, and other tasks necessary to accomplish those functions. *Except as specifically provided by law, the State Court Administrator and circuit courts may not disclose source lists obtained from private or public entities, and jury lists containing names selected from a source list, to any other person or public entity.*"

Only one statute "specifically provide[s]" for the disclosure of jury pool information. Under ORS 10.275, a person who wants to "challeng[e] a jury panel under ORS 136.005 or ORCP 57 A," that is, the litigant in a civil or criminal trial who asserts that the jury was unlawfully selected, may

---

[2] Whether jury lists are public records under the PRL is an open question; the "court records" referred to in ORS 192.410(4) may include only the records listed in ORS 7.010, which do not include jury lists. However, we need not decide that issue because we conclude that ORS 10.215(1) prohibits disclosure. Thus, if jury lists are *not* public records, ORS 10.215(1) prohibits disclosure by its own terms. If jury lists *are* public records, ORS 10.215(1) is one of the statutory exceptions to the PRL referred to in ORS 192.420(1). ORS 192.502(9). Although we presume that jury lists are public records and ultimately conclude that the PRL does not require courts to disclose them, that conclusion does not imply that the legislature could pass a statute that did contain such a requirement without violating separation of powers by unduly burdening the Judicial Department. Or Const, Art III, § 1.

request access to information otherwise confidential under ORS 10.215(1), and the court, under certain strictly limited circumstances, may order the information released. However, ORS 10.275(5) provides that "[t]he procedure established by this section is the exclusive means for compelling production of confidential jury records[.]" Only one plaintiff— Langley—is a litigant, and he explicitly disavows any attempt to gain access to records under ORS 10.275(5).

To recapitulate: Defendants argue that the PRL does not require disclosure because that act creates an exemption for information that is confidential under other statutes, and, under ORS 10.215, jury lists are confidential unless those lists are requested by a litigant pursuant to ORS 10.275, which has not occurred here.

Plaintiffs' contrary argument is not persuasive. Like defendants, they note that ORS 192.420 generally requires disclosure unless another statute within the PRL creates an exception; they also agree that ORS 192.502(9) creates an exception for documents the disclosure of which is prohibited or limited by Oregon law. They disagree, however, about the scope of ORS 10.215(1), the statute that, according to defendants, prohibits disclosure of jury pool records. According to plaintiffs, that statute does not prohibit disclosure for two reasons. First, it is permissive and not mandatory: it states that the State Court Administrator and circuit courts "may not disclose" the records, not that they "shall not" disclose them. Thus, they apparently contend, the statute should be read to imply that the officials may disclose them, or they may not, at their discretion. The fatal flaw in that argument is that it ignores ORS 174.100, which provides,

> "As used in the statute laws of this state, unless the context or a specially applicable definition requires otherwise:
>
> "* * * * *
>
> "(4) 'May not' and 'shall not' are equivalent expressions of an absolute prohibition."

Plaintiffs' second asserted reason why ORS 10.215(1) does not prohibit disclosure of jury records is that,

even if the phrase "may not" means "shall not," the prohibition is qualified by the phrase, "Except as specifically provided by law[.]" According to plaintiffs, ORS 7.130, in combination with ORS 10.215(5), specifically provide for the disclosure of jury records.[3] The latter statute requires the trial court administrator to place a master jury list "on file in the circuit court as soon as possible after it is prepared," and the former requires court personnel, "[w]henever requested," to "furnish to any person a certified copy of any portion of the records or files in the custody of the clerk or court administrator." Together, according to plaintiffs, the statutes require court personnel, upon request, to disclose to "any person" the "records" or "files," which must include the master jury list.

This argument misconstrues the terms "records" and "files." "Records" in ORS 7.130 refers to "a register and jury register." ORS 7.010(1). A "register" is a list of cases, ORS 7.020, and a "jury register" is a record of people who have, in any particular term, served as jurors, ORS 7.070. Neither the register nor the jury register contains the jury pool information that plaintiffs have requested. "Files" in ORS 7.130 refers to "papers * * * filed with or by the clerk of the court or court administrator, *in any action, suit or proceeding therein*, or before the judge." ORS 7.090 (emphasis supplied). The term, in other words, encompasses papers submitted to the court in the process of adjudicating a case and made part of the case file. Master lists, source lists, and term lists are not included in case files. Thus, the documents that court personnel must disclose to "any person" do not include the jury pool information at issue in this case. Consequently, ORS 7.130 in combination with ORS 10.215(5) is not a law that "specifically provide[s]" for disclosure of the records plaintiffs seek; the prohibition in ORS 10.215(1) therefore applies. Thus, the PRL does not require disclosure of jury pool information except in very limited circumstances not present in this case, that is, when a litigant has made a qualifying request pursuant to ORS 10.275.

---

[3] Plaintiffs also cite ORS 1.025, ORS 7.110, ORS 8.125, ORS 192.420, ORS 192.430, and ORS 357.001. They offer no explanation of how those statutes "specifically" provide that jury records may be disclosed.

■      Of course, if some constitutional provision confers on plaintiffs a constitutional right of access to the information, the fact that a statute permits denial of access is irrelevant; the statute would be unconstitutional. Plaintiffs cite several state and federal constitutional provisions as sources of the asserted right of access to jury lists: Article I, sections 8, 10, and 20, of the Oregon Constitution, as well as the First Amendment to the United States Constitution. We begin with the state constitutional claims.[4]

■      We can quickly dispose of two. Plaintiffs' claim under Oregon's free speech guarantee, Article I, section 8, is two-fold. They argue first that the statutory prohibition against releasing jury pool information violates the free speech rights of defendants who might want to release it. Second, they argue that, by withholding important information, defendants impose a prior restraint on plaintiffs' right to speak freely about that information. Plaintiffs lack standing to assert the first argument, and the second is far-fetched. Subscribing to either of the arguments would necessarily imply that government cannot have confidential information. Plaintiffs cite no authority under Article I, section 8, to support such a proposition, and we are unwilling to adopt it. *See State ex rel Oregonian Pub. Co. v. Deiz*, 289 Or 277, 288, 613 P2d 23 (1980) (Linde, J., concurring) ("[T]here is much that government may legally keep undisclosed.").

■■      Article I, section 20, Oregon's equality guarantee, prohibits the government from making a benefit available to one citizen or class of citizens except insofar as the benefit "equally belong[s] to all citizens." Plaintiffs contend that the statutory scheme allowing litigants access to information

---

[4] Defendants argue that plaintiff Shannon, the only plaintiff bringing constitutional claims under the Declaratory Judgment Act, ORS 28.010, lacks standing under that statute because he "seeks merely to vindicate a public right to have the laws of the state properly enforced and administered," *Eacret v. Holmes*, 215 Or 121, 125, 333 P2d 741 (1958), and has only "an abstract interest in the correct application or the validity of a law," *League of Oregon Cities v. State of Oregon*, 334 Or 645, 658, 56 P3d 892 (2002). We hold that those requirements do not apply when the right at issue is either the open courts provision of Article I, section 10, of the *Oregon Constitution*, or the "right of access to information about trials" under the First Amendment, because, as we discuss below, the courts have explicitly held that those rights belong to the public generally and not to any individual more than another.

about jury records but denying that access to everybody else violates the equality guarantee. That claim rests on the proposition that "litigants" or "nonlitigants" comprise a "class" for purposes of Article I, section 20. A class, however, consists of persons who, regardless of laws that may treat them as a group, share some trait or characteristic that is widely regarded as forming the basis for meaningful social or ethnic categories such as race, legitimacy, gender, or geographical residence. *State v. Clark*, 291 Or 231, 240, 630 P2d 810, *cert den*, 454 US 1084 (1981). "Litigants" comprise what is sometimes called a "pseudo class," that is, a group of people who would not be regarded as a cohesive group were it not for some law or laws that set them apart. *Id.* Under Oregon Supreme Court case law, Article I, section 20, simply does not bear on such classifications, much less prohibit them. *See Sealey v. Hicks*, 309 Or 387, 397, 788 P2d 435 (1990).

■ Plaintiffs' claim under the "open courts" provision of Article I, section 10, has more intuitive traction. That section provides, among other things, that "[n]o court shall be secret, but justice shall be administered * * * openly." The language is absolute. *Oregonian Publishing Co. v. O'Leary*, 303 Or 297, 302, 736 P2d 173 (1987). It creates a right that inheres not in any individual but in the public as a whole. *Deiz*, 289 Or at 282-84. Its purpose is not to protect litigants, but to ensure "visibility in the administration of justice * * *. Open justice 'serves to assure accountability [to the public] for the charge not prosecuted, the reduced plea accepted, the evidence used or not used.' " *O'Leary*, 303 Or at 304 (quoting *Deiz*, 289 Or at 289 (Linde, J., concurring)). Thus, the open courts provision seems tailored to vindicate plaintiffs' claim that they are entitled to jury pool records because, if such records are kept from the public, those who assemble the lists cannot be held accountable unless some litigant requests access under ORS 10.275(1)—an event not likely to benefit members of the public who, for example, would like to ensure that they are not deprived of the opportunity to serve as jurors.

■■ The case law, however, defeats plaintiffs' claim. The Supreme Court has held that, although the open courts provision "is written in absolute terms," it is nonetheless not absolute; "not every proceeding involving the administration of justice, in the general sense of that term, need be open to

the public." *O'Leary*, 303 Or at 303. The guarantee operates under two limitations: it "may not" apply to aspects of the judicial process such as jury deliberations and the conferences of collegial courts "that were closed to the public by well-established tradition at the time of the adoption of the Oregon Constitution," *id.* (citing *Deiz*, 289 Or at 284), and "it is directed only at adjudications," *id.* at 303. Defendants do not argue that jury pool records were traditionally closed, but they do contend—correctly—that the lists and the process of assembling them are not "adjudications."

■ Although the cases do not explicitly define "adjudication" for purposes of the open courts provision, they give clear and consistent indications that the term refers to "the fundamental function of courts," which is "to determine legal rights based upon a presentation of evidence and argument." *Id.*, *see also Deiz*, 289 Or at 288 (Linde, J., concurring) ("that function which brings the law to bear on individuals and puts the generalities of policy to the test of the concrete case"). Further, as this court has noted, "all of the cases that have addressed the meaning of the phrase 'justice shall be administered' in section 10 have consistently limited its applications and adjudications to judicial functions." *Oregon Newspaper Publishers v. Dept. of Corrections*, 156 Or App 30, 37, 966 P2d 819 (1998), *rev'd on other grounds*, 329 Or 115, 988 P2d 359 (1999). Finally, an "adjudication" appears to refer only to those judicial functions that occur during the actual trial process; carrying out a death sentence, while surely the ultimate rendering of a judgment, is not for that reason open to the public. *Id.*

We therefore conclude that the open courts guarantee of Article I, section 10, applies only to those proceedings, in court and before a judge, that are immediately related to the presentation of evidence and argument. The assembly of jury lists for any particular adjudication occurs before the adjudication has begun, is only indirectly related to the presentation of evidence or argument, and is not presided over by a judge. Therefore, although it might have an important impact on adjudications, it is not part of an adjudication subject to the open courts guarantee.

■ Our conclusion that defendants have not violated any of plaintiffs' rights under the Oregon Constitution does not end the constitutional inquiry. Plaintiffs may have more or greater rights under the federal constitution, and, if they do, the state is powerless to infringe on them even if it could do so without violating its own constitution. We therefore turn to plaintiffs' claim under the First Amendment to the United States Constitution: the claim that, as members of the public, they have a right of access to documents relevant to the jury selection process.

■ That claim finds support in *Press-Enterprise Co. v. Superior Court*, 464 US 501, 104 S Ct 819, 78 L Ed 2d 629 (1984) (*Press-Enterprise I*). In that case, the plaintiff contended that it had a right to attend the *voir dire* proceedings in a capital murder trial and that the right was separate and distinct from the accused's right to a public trial in the underlying case. The trial court denied access and the California Supreme Court denied review. *Id.* at 504-05. The United States Supreme Court granted certiorari and reversed. Reviewing the history of criminal trials, the Court concluded that, "beginning in the sixteenth century, jurors were selected in public" and that "[t]he presumptive openness of the jury selection process in England, not surprisingly, carried over into proceedings in colonial America." *Id.* at 507-08. The Court described the continuing value of openness:

> "The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."

*Id.* at 508 (emphasis in original). Thus, the Court concluded, the jury selection process is presumptively open, and the presumption can be overcome only if those urging closure can show "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored

to serve that interest." *Id.* at 510. The Court found that, although juror privacy could, in some instances, be such an interest—for example, where the juror had to answer personal questions as part of the *voir dire* screening—there was nonetheless no justification for denying access to the entire process. *Id.* at 511-13. Although three justices wrote concurring opinions, none dissented, and all agreed that the right of access to criminal trials belonged not to the defendant but to the public.

The Court returned to the subject of access to trials and elaborated on it in *Press-Enterprise Co. v. Superior Court*, 478 US 1, 106 S Ct 2735, 92 L Ed 2d 1 (1986) (*Press-Enterprise II*). The issue, as described by the Court, was "whether [the plaintiff] has a First Amendment right of access to the transcript of a preliminary hearing growing out of a criminal prosecution." *Id.* at 3. After a 41-day hearing preceding a capital murder trial, the plaintiff sought release of the transcript. The presiding magistrate refused and the California Supreme Court agreed, holding that the First Amendment right described in *Press-Enterprise I* applied only to trials themselves and not to pretrial proceedings. Again, the United States Supreme Court granted certiorari and reversed. *Id.* at 6.

The Court reemphasized that the right at issue emanated from the First Amendment, not the Sixth, and that it belonged to the public. *Id.* at 7-8. The Court also emphasized that the applicability of the right did not depend on the label given to the event to which the plaintiff sought access. *Id.* Rather, the Court articulated what has come to be known as the "experience/logic" test. *In re Disclosure of Juror Names and Addresses*, 233 Mich App 604, 610, 592 NW2d 798, 801 (1999). To determine whether a particular aspect of a criminal proceeding is presumptively open, the Court will look first to history to determine "whether the place and process have historically been open to the press and general public." *Press-Enterprise II*, 478 US at 8. It will then determine "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* (citing *Globe Newspaper Co. v. Superior Court*, 457 US 596, 606, 102 S Ct 2613, 73 L Ed 2d 248 (1982)). If the process meets the test of history and logic, then it is presumptively open, and

" '[t]he presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Press-Enterprise II*, 478 US at 9 (quoting *Press-Enterprise I*, 464 US at 510). Applying the foregoing criteria, the Court concluded that the preliminary hearing was presumptively open, that the interest in avoiding pretrial publicity was not sufficiently compelling, and that, in any event, closing the entire 41 days of the hearing was not a narrowly tailored prophylactic measure. *Press-Enterprise II*, 478 US at 13-15.

The two *Press-Enterprise* cases, then, establish a test for closure that

> "is extremely hard to meet. In fact, since [1979], the Court has found a qualified First Amendment right of access to practically every aspect of the judicial process * * *. Lower courts have followed the Supreme Court's lead, and have expanded the areas of access, with [the Second Circuit], for example, finding a qualified access right extending not only to pretrial hearings, but also to the Criminal Justice Act compensation forms filed by appointed counsel for indigent defendants. The Second Circuit has also found a qualified access right extending to written documents filed in connection with pretrial suppression motions and other motions, even when they include wiretap material[.]"

Kimba M. Wood, *Reexamining the Access Doctrine*, 69 S Cal L Rev 1105, 1107-08 (1996) (citations omitted). The Ninth Circuit has also expanded on the Supreme Court's case law, applying the principles from the *Press-Enterprise* cases to establish rights of access to pretrial proceedings. *Seattle Times Co. v. U.S. Dist. Court for Western Dist. of Washington*, 845 F2d 1513, 1517 (9th Cir 1988) (bail eligibility proceeding). *But see Times Mirror Co. v. U.S.*, 873 F2d 1210, 1220 (9th Cir 1989) (no public access to search warrant affidavits during investigation and before indictment).

Although "the majority of courts that have addressed [the] issue have recognized a right of access to juror names and addresses," *State ex rel Beacon Journal v. Bond*, 98 Ohio St 3d 146, 156, 781 NE2d 180, 192 (2002), the cases typically deal with that information in the context of *voir dire* and not general jury lists. However, we believe that,

although access to jury lists is not the same as access to *voir dire*, the differences are not significant.

The Supreme Court's conclusion that the *voir dire* process is presumptively open to the public states the operative principle more generally: it announces that *"jurors were selected in public"* and that "[t]he presumptive openness of *the jury selection process* in England, not surprisingly, carried over into proceedings in colonial America." *Press-Enterprise I*, 464 US at 507-08 (emphasis added). The reason for using general terms is that, at the historical moment under discussion, jurors were selected directly from among the qualified members of the public.

The introduction of a multi-step process complicates our inquiry for two reasons. First, it requires us to determine whether a modern elaboration of a traditional practice is itself traditional. Second, it requires us to determine whether the rationale that supports public access to the part of the jury selection process that occurs in conjunction with an identifiable trial also applies to those parts of the process that occur before any particular dispute has entered the judicial system. We conclude that the answers to these inquiries point in the direction of requiring access to jury lists in criminal trials.

In other contexts, Oregon courts have held that, when a historical fact or circumstance evolves over time, constitutional principles applicable to the historical fact or circumstance apply with equal force to the evolved fact or circumstance. Thus, in *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982), the Supreme Court's list of examples of "historical exceptions" to free speech principles includes "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud *and their contemporary variants*." (Emphasis added.); *see also In re Lasswell*, 296 Or 121, 124, 673 P2d 855 (1983) (exception applies to speech prohibition that "falls within an *original or modern version* of a historically established exception" (emphasis added)). In discussing the right to bear arms under Article I, section 27, the court held, "The appropriate inquiry in the case at bar is whether a kind of weapon, *as modified by its modern design and function*, is of the sort commonly used by individuals for personal defense

during either the revolutionary and post-revolutionary era, or in 1859 when Oregon's constitution was adopted." *State v. Delgado*, 298 Or 395, 400-01, 692 P2d 610 (1984) (emphasis added). The "classes of citizens" protected by the anti-discrimination principles that the framers adopted in Article I, section 20, include not only the groups that the framers would have included, but their modern counterparts as well. *Cox v. State of Oregon*, 191 Or App 1, 7, 80 P3d 514 (2003) (Schuman, J., concurring).

Further, to the extent the historical record provides useful information, it indicates an open process. According to Sir Matthew Hale, *The History of the Common Law of England* 337-39 (Charles Runnington ed 1820), a writ would issue to the county sheriff, who would summon 24 qualified property-owning men from the local neighborhood and write their names on a small sheet of parchment called a "panel." The empaneled men would then "be brought, or summoned * * * for their appearance at the trial; whereby the parties may have notice of the jurors, and of their sufficiency and indifferency, that so they may make their challenges upon the appearance of the jurors, if there be just cause." *Id.* at 340. After challenges, 12 members would be selected. Thus, the entire process was conducted in public. *See also* William Blackstone, *Commentaries on the Laws of England* 518-23 (Wm. H. Browne ed. 1892).

In Oregon, before the enactment of ORS 10.215 in 1985, no provision of law kept jury lists from public disclosure and, although the evidence is not extensive, there is reason to believe that the accepted practice in at least some courts was to make them available for inspection. In *Bramwell v. Rowland*, 123 Or 33, 36, 261 P 57 (1927), for example, the court examined a motion for a change of venue based on the assertion that "the inhabitants of Lincoln [C]ounty, where this action was commenced, were so prejudiced against the defendant that he could not expect an impartial trial in that county." The court recited that an interested party "had examined the jury list, and found that only a very small percentage of the jurors were" potentially biased. *Id.* at 39. Further, in hearings on House Bill (HB) 2545 (1985), which ultimately became ORS 10.215, at least one lawyer-legislator asserted that it was his practice to examine jury lists before

trial. Tape Recording, House Judiciary Committee, Subcommittee 2, HB 2545, Apr 12, 1985, Tape 435, Side A (colloquy among R. William Linden, State Court Administrator; Rep Mike Kopetski; and Rep Stan Bunn). In sum, we see no reason why the historical respect paid to new aspects of jury selection such as the assembly of jury lists should differ from the respect paid to the original ones such as *voir dire*.

The timing of jury list creation presents a different question. Although *Press-Enterprise II* and lower court decisions hold that the right of access applies not only to the trial itself but also to preliminary hearings and other proceedings that occur before an actual jury is empaneled, that fact does not address the question whether the right also applies to procedures that are as remote from actual trials as the assembly of jury lists. When that process takes place, the term during which the selected jurors will sit has not begun. ORS 10.225(1). However, we believe that fact to be irrelevant. The United States Supreme Court has noted the importance of a jury selection system that ensures not only fairness itself but the public appearance of fairness. "[P]ublic proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and *openly* selected." *Press-Enterprise I*, 464 US at 509 (emphasis added). Both federal and state law recognize the fundamental value of juries that represent a fair cross-section of the population. *Lockhart v. McCree*, 476 US 162, 184, 106 S Ct 1758, 90 L Ed 2d 137 (1986) ("[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial[.]"); 28 USC § 1861 ("It is the policy of the United States that all litigants in federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."); ORS 10.215(1) (requiring source list that "will furnish a fair cross section of the citizens of the county").

Under a system such as Oregon's, in which the particular jury ultimately empaneled in any given trial is drawn randomly from a pool that is itself selected before a jury term, adequate protection of the public's right (as well as the defendant's and potential jurors' rights) must begin at the source of

the process itself, at the aptly named "source lists." ORS 10.215. Opening *voir dire* does not alone suffice to guarantee that a jury is untainted, because taint at the source could flow forward at each subsequent step. Thus, to protect the values guaranteed by the First Amendment right of access to the jury selection process, that process must be open from the first step. We therefore conclude that the source lists, master lists, and jury term lists used in criminal trials are presumptively open to the public. Because Oregon does not use different lists for criminal and civil juries, all the lists are presumptively open.[5]

That conclusion, however, does not mean that defendants must now provide plaintiffs the relief that they seek. Defendants may overcome the presumption in favor of openness by establishing that closure serves an overriding interest and that it will be carried out by narrowly tailored means. *See Press-Enterprise II*, 478 US at 13-14. That determination occurs on a case-by-case basis and must be accompanied by "specific, on the record findings." *Id.* at 13. Further, the party seeking nondisclosure has the burden of presenting facts supporting it. *Oregonian Pub. Co. v. U. S. Dist. Court for Dist. of Oregon*, 920 F2d 1462, 1467 (9th Cir 1990), *cert den*, 501 US 1210 (1991).

For the foregoing reasons, we reverse the trial court's grant of summary judgment and remand so that defendants have the opportunity to rebut the presumption in favor of plaintiffs' access to the lists.[6]

Reversed and remanded.

---

[5] *Accord Pantos v. City and County of San Francisco*, 151 Cal App 3d 258, 262, 198 Cal Rptr 489, 492 (1984) ("The master list of qualified jurors has the status of a judicial record, available to the public in general. There are no exemptions and no compelling reasons for nondisclosure.").

[6] In order to prevent delay and the needless expenditure of judicial resources, we offer the following observation. Although protecting highly personal information about jurors may be an adequately compelling interest to override the presumption in favor of access, merely protecting their names and addresses is not, in the absence of unusual circumstances such as threats to their safety. *Press-Enterprise II*, 464 US at 511-12.